**LAW OFFICE OF FRED GAGLIARDINI**
Fred Gagliardini, SBN 202781
Mary A. McGrath, SBN 266400
1227 California Avenue
Bakersfield, California 93304
(661) 755-5757

Attorneys for Defendant
Patrick Mara

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff<br><br>v.<br><br>PATRICK MARA,<br><br>　　　　　　　Defendant | Case No.: 1:16-CR-00080-001-LJO-SKO<br><br>SENTENCING MEMORANDUM<br><br>COURT: Hon. Lawrence J. O'Neill<br><br>Date: October 24, 2016<br>Time: 10:30 a.m. |

# INTRODUCTION

Pursuant to Title 18 U.S.C. § 3553(a), Rule 32, *Federal Rules of Criminal Procedure*, Section 6A1.3 of the *United States Sentencing Guidelines*, and this Court's Policy Regarding Procedures to Be Followed in Guideline Sentencing, Defendant PATRICK MARA, by counsel, hereby states that he has received and reviewed the final Presentence Investigation Report.

Despite the Probation Officer's recommendation, Patrick respectfully requests that this Court depart downward from the advisory guidelines pursuant to U.S.S.G. § 5K1.1 in the greatest amount permitted by law.

Patrick also seeks an additional downward departure from the advisory guidelines pursuant to U.S.S.G. § 3B1.2 based on the Presentence Investigation Report stating that he was "not an organizer, leader, manager, or supervisor in the criminal activity". (PSR page 8, section 27.)

Moreover, that this Court strike the "deadly weapon" upward departure based on U.S.S.G. § 2D1.1 – Commentary 11(A).

Pursuant to 18 U.S.C. § 3553(a), Patrick respectfully requests that the Court impose a total sentence of 36 months, which is more than sufficient to comply with the purposes of sentencing under the statute.

## BACKGROUND

Patrick Mara. This name means very little to most, but to some it means everything. Patrick Mara is a 36 year-old husband, and the father of two children who mean the world to him - and he to them. He is a former police officer who, for less than one year, violated the tenets of his oath to serve and protect the Bakersfield community.

To learn who Patrick Mara really is, one must delve deeper into his life and circumstances. Patrick's parents were law enforcement officers with distinguished

careers. His nights as a child were filled with real life cops and robber stories told by his parents, who were talking about their day-to-day activities.

Imagine for a moment, sitting at the dinner table after a home cooked meal, listening to the two most important people in your life tell you about life and death situations, dark alleys, and fearless heroics of stopping criminals dead in their tracks. Patrick's father played cops and robbers with his son all the time, shouting, "STOP! POLICE!" and Patrick giggling and pretending to run away, only to be caught, cuffed, and stuffed.

Patrick learned from an early age the importance of police in our community; that police officers are heroes. Patrick attended many police functions, meeting other officers, and watching the inseparable bond between this brotherhood of strangers. Police officers are blood brothers and the blood runs blue. This blood is stronger than any other tie. Officers are doing something greater than themselves, greater than their families, and their bond to each other is worth protecting at all costs. An officer believes, and so did Patrick at that young age, that it is Us versus Them. We are the police, and we protect each other no matter what. They are criminals, and we must rid our streets of this plague.

This thin blue line of blood coursing through the veins of our officers is crucial to their survival. It demands loyalty above all else. If you can't trust the person backing you up, you are a dead man. Patrick Mara learned this and internalized it to the core of his being. He wanted to follow in his parents' footsteps and make them proud.

Patrick graduated from high school, worked at Cal Trans for a few years and was excelling at his work. Something, though, was missing from his life. A small boy was inside of him, who always dreamed of being a police officer. In 2003, Patrick made the decision to apply to the Bakersfield Police Department, and to his elation, he was accepted. The academy was a trial by fire, learn on the go, operation. Patrick worked hard and his hard work paid off with graduation from the academy and being assigned to patrol. As he stood up on stage, receiving his badge, he beamed with pride as his parents lovingly looked on. Their pride was palpable in the strong bear hugs he received for a job well done, and for the career he was embarking on.



Patrick Mara jumped into his new career with both feet. He worked hard, stayed late, helped out anyone who needed it, and felt like he was really making a difference. His new band of brothers all bled that same blue color he had in his veins. He believed that he finally had a family just like the family his parents were a part of. He took his loyalty seriously, and vowed never to betray his fellow officers. There was a very strict order of seniority, and under no circumstances was it permissible to disobey a senior officer. Patrick Mara's hard work paid off, and two years after going out on patrol, in 2005, he was selected to be a part of the Special Enforcement Unit. This unit was the best of the best, the elite, and came with extreme responsibility. The cops and robbers game he played with his father was no longer a game, but the real life thing.

While his career was in full swing, Patrick met and fell in love with his wife and had their first child, a beautiful boy, and Patrick's life was forever changed. He loved his family dearly. For Patrick though, his blue-blooded brothers came first. His passion for his work quickly left his family without the love of a father they so desperately needed. Patrick was burning the candle at both ends, and his family suffered for it.



He knew he was not fulfilling his duties as a father and husband, but he just couldn't let his blue-blooded family down. In 2007, he had his second child, a daughter.

Although times were good enough for another child, it was soon realized that his wife had become a single mother of two, with a husband who made brief appearances in their lives. His wife persisted, and the arguing over his work schedule became the main topic of discussion. Patrick was ill-prepared to face the issue of failing his family, and so he worked even longer hours, and when he had time off, he chose to spend it drinking with his blue-blooded family. They understood his battles and the importance of his work.



When he realized his wife was on the brink of leaving, he transferred back to patrol from the SEU, and worked regular hours for a few months. What he nor his wife realized was the financial strain no overtime hours really meant. They were broke, struggling to make ends meet, which caused only more concern and issues within the

home. Patrick went back to his blue-blooded family, and again began working lengthy hours and spending his free time drinking with his blue-blooded family. This choice would later become Patrick's biggest regret. Once again, he was running on adrenaline and drive.

In 2010, he was an amazing officer. He was receiving accolades, and all of his brothers knew he could really be counted on for anything. However, he was losing his wife and children with each passing day. His children were finally old enough to play sports and Patrick jumped on this opportunity to try and mend the broken relationships. He attended counseling with his wife, and became a regular church going family. This was encouraging to all involved and everything was heading in the right direction.

Case 1:16-cr-00080-LJO-SKO   Document 13-2   Filed 09/06/16   Page 19 of 51

 **BAKERSFIELD POLICE MEMORANDUM** 

February 24, 2010

To: Below-listed Officers
From: Lieutenant J. Mullins, Special Enforcement Unit
Subject: Assault with a Deadly Weapon Arrest

On February 23, 2010, Officers Sean Underhill and Pat Mara responded to 1004 7th Street for a check the welfare after a parent refused to send his small children to school. On arrival, the officers encountered Reynaldo Canales, an adult male who was acting in a bizarre manner consistent with drug use and mental illness.

Canales armed himself with a large stick and swung it at the officers while babbling incoherently. Officer Underhill deployed his Taser, but Canales was able to overcome the effects of the Taser and retreat into a bedroom. Canales armed himself with a metal studded belt and a golf club.

The officers, with assistance from Officers Jeff Sallee, Andrew Borton, and Sean Woessner, forced entry into the bedroom and eventually subdued Canales using batons and pepper spray. The officers arrested Canales for assault with a deadly weapon, felony resisting, and other charges. Canales received only minor injuries.

All of the officers involved used admirable restraint when faced with an armed and assaultive offender. The professional response and sound tactics of the officers saved Canales from serious injury while safely subduing him and quickly ending a dangerous situation. The officers are commended for their response.

cc: personnel files
Officer Underhill
Officer Mara
Officer S. Woessner
Officer A. Borton
Officer Sallee

Then in 2011, Patrick heard the call of his blue-blooded family and was transferred into the H.I.D.T.A. Narcotics Task Force. This was another new adventure for Patrick, including undercover work, plain clothes, and a plain car. He was really doing the stuff movies were made out of. His wife was wary, but Patrick was sure he could juggle both families successfully. Patrick was dead wrong. Patrick wound up in bankruptcy, and his marriage was holding on by the thread of two small children. Amidst all of this, his career was skyrocketing. He was nominated for Exceptional Officer of the Year Award by the Kern Law Enforcement Association. He was doing great work, and making that difference he always wanted to. Little did he know that this new assignment would be his downfall.



16-cr-00080-LJO-SKO   Document 13-2   Filed 09/06/16   Page 25 of 51

**Division Commander Commendation**

March 6, 2012

On December 29, 2011, Officer Pat Mara was assigned to the Southern Tri-County HIDTA Narcotics Enforcement Team. Officer Mara conducted a month long complex investigation targeting a suspected major narcotics vender, who resides in the Wasco area of Kern County. Officer Mara's search warrant in Wasco netted the arrest of three adults and the seizure of **852 pounds of processed marijuana and 4 semi-automatic hand guns**. The estimated value of the Marijuana is **1.7 million dollars**. Evidence at the scene suggested that the suspects were possibly using their children to assist in the sorting and processing of the narcotics. Officer Mara conducted interviews with four juveniles, ages 7 to 13, and confirmed his suspicion. The children were taken into protective custody removing them from this highly dangerous environment.

Officer Mara used multiple investigative techniques including electronic and physical surveillance, coordination with multiple outside agencies from the Los Angeles area, and the coordination of simultaneous search warrants served in Kern and Los Angeles Counties. Officer Mara handled this complex investigation flawlessly and required little to no guidance or direction.

Detectives in Los Angeles seized several more pounds of marijuana as well as several ounces of cocaine.

This is the largest seizure of processed marijuana by any agency in the central valley in recent history. Officer Mara is commended for his skill and tenacity which led to the successful outcome of this investigation.

On January 27, 2012, Officer Mara conducted a month long investigation which involved the interstate transportation of large sums of currency and narcotics. Officer Mara coordinated with several outside agencies at the local and federal level. Officer Mara worked on scene with these agencies to coordinate the interception of a vehicle that contained **$215,000** and **one kilogram of cocaine**. Two suspects were arrested and face federal charges.

The aforementioned cases required a great deal of investigative skill, planning, coordination and patience. Officer Mara is commended for his outstanding performance.

Captain Hajir Nuriddin,
Investigations Division

In spring of 2012, Dimacio Diaz was assigned to be Patrick's partner. Diaz was a more senior officer, and Patrick was excited to learn from a more seasoned veteran of the department. Diaz had been in the unit for over a year, and seemed to have all of the ins and outs dialed in. One of the first warrants Patrick served with Diaz, Diaz walked out of a bedroom and handed Patrick a few hundred dollars, while he stuck a large amount of money into his own pockets. Patrick was shocked, scared, and realized his life would never be the same. Patrick found himself in the worst of positions.

Between a rock and hard place, Patrick had his senior officer clearly doing something illegal and bringing him into it. Patrick also knew he owed his blue-blooded brothers ultimate loyalty, regardless. Besides, who would believe him? This is his senior officer, someone to be looked up to. Maybe this was just how things were done, and that he needed to go along to get along. He knew that if he said anything, he would betray that blue blood that his entire life was built on. On the other side of the rock, the hard place, he knew he took an oath to protect and serve, and to obey and uphold the law. Patrick was stuck. Disgrace was seemingly guaranteed either way.

Once again, Patrick chose the blue line and remained loyal to his blue-blooded brother, Diaz. Tragically, his loyalty became a very slippery slope. What began as a few hundred bucks, turned into stealing drugs, trafficking them, and getting a cut of the proceeds, with Diaz being the ringleader in this dangerous criminal world. Patrick began to alter his moral fabric to account for these clearly criminal activities, beginning to believe that the guys he was taking from were bad guys anyway, and they deserved it.

The "bad guys" line blurred with every transaction he and Diaz made. His loyalty to Diaz kept him continuing on this path, but not without Patrick suffering for it.

Shortly after partnering with Diaz and beginning the illegal activities, Patrick began coping with his calamitous decisions by consuming more alcohol. Patrick gave in, and succumbed to the dirty money and the loyalty to his senior partner. It was the darkest period of Patrick's life. He knew in his heart that he had betrayed all that he had become a police officer for, and that he would pay for his sins.

Patrick's brother summed it up best:

**Honorable Lawrence O'Neill,**

**As Patrick's younger brother, I've seen him make many mistakes over the years. Obviously none near as substantial as this. First, I would like to share with you a little about the type of person my brother is. Mistakes weigh heavy on him because he is a caring individual who holds himself to a high standard. When he makes poor decisions, naturally he is disappointed in himself. However, more importantly to him, he is more concerned with how others are affected opposed to how he is personally affected. After speaking to him about the inexplicable situation he is responsible for putting himself in, it is evident he is more concerned by the impact this has had on others. He will always be more troubled by how his irresponsible behavior reflects on his family, the suffering his wife and children will endure, the financial hardship it has created, the betrayal of the men and women he worked alongside of, and violating the community's trust.**

His time with Diaz was a short seven months, ending in January of 2013, when he was again promoted - this time from Senior Officer to Detective - and transferred out of the narcotics unit. It was as if a large albatross was lifted from around his neck. Finally, maybe he would have a fresh start and a chance to atone for his sins. Patrick was determined to go back to his days prior to narcotics and be the cop his family hugged at

graduation from the academy. He never stole another drug, or another dime from those he encountered. He went back to being that great officer who his children could be proud of. Drinking still had a hold of him, until his daughter saved him in one phone call asking him to come home. There and then, Patrick decided that the drinking must end and he would do whatever it took to repair the damage he had done to his wife and children.



In October 2013, Patrick was transferred to the sex crimes unit, and suddenly there were good guys and bad guys again. He invested himself in the cases and was lucky to have a wife to lean on as these cases took their emotional toll. These victims were the

same ages as his children. Patrick spent many sleepless nights worrying about how he would ever be able to protect his children.

In 2014, Patrick's son was a multiple time national champion wrestler with his Dad as a coach. Patrick loved the bonding with his children, and spent a large amount of time traveling with his children to soccer games and wrestling matches. Finally Patrick thought the past was behind him and he could lead the kind of life to be proud of.



In February 2015, Patrick was promoted to the rank of Sergeant and was so proud. The happiness was short lived, because two weeks later, Diaz was walked off the job by the FBI. Again, Patrick's world came crushing down around him, and he knew then that he had not even come close to paying for the sins of his past. Patrick knew that no amount of good solid police work would ever atone for what he did during that fateful seven-month partnership with Diaz.



Patrick was to be questioned by the FBI, and obtained a Union-paid lawyer who reminded him that talking never brings a positive outcome. Besides, that blue line was still there for Patrick, and that line says you don't snitch on another blue-blooded brother. Unfortunately, this terrible legal advice resulted in Patrick denying any involvement and

providing no useful information about their activities. All the while, the investigation grew, as did the weight of the methamphetamine involved. The entire time, Patrick knew in his gut that remaining silent was the wrong thing to do. He realized he needed to seek out new counsel and do the right thing.

On February 16, 2016, Patrick hired his current counsel. Within hours of Patrick contacting current counsel, a phone call was made to begin the process so that Patrick could finally unburden himself of what had happened. Within a few days, Patrick and current counsel met with investigators and he came clean about his activities, and his involvement in Diaz's schemes. Patrick shortly thereafter entered into a plea agreement and fully admitted culpability for his actions and poor decisions. On advice of his current counsel, he has cooperated many times and will continue to do so. Patrick feels it is his duty to cooperate in any way possible.

Patrick knows he betrayed his family, his parents, his friends, the community, and his blue-blooded family.

Patrick went even further to illustrate his remorse when he willingly spoke at a press conference in May, 2016. He openly apologized to the entire community, including his blue-blooded family, personal friends, and family. Patrick did this prior to being indicted and without the promise of any plea agreement. Patrick spends each night apologizing to everyone he has hurt through his prayers. Patrick has learned the hardest lesson of all. The right thing to do never has a side, it never wavers, regardless of who might be disgraced. Patrick finally knows what the right thing to do is: follow your

moral compass no matter what it takes. Patrick hopes and prays that he will be able to instill this principle in his children.



# ARGUMENT

## I.
## The Court Should Depart Downward Based on cooperation in conformity with U.S.S.G. § 5K1.1

Although Patrick was at first guided by prior counsel to refrain from cooperating with the Government in this case, Patrick eventually retained current counsel and was quick to cooperate. In fact, Patrick was cooperating in an interview as recently as October 19, 2016.

Patrick made a publicly televised admission of his wrongdoing prior to being indicted and has remained willing to cooperate with the Government in accord with his anticipated entry of a Plea and his moral duty to do so.

## II.
## The Court Should Impose a Sentence of 36 months, a Sentence that is Sufficient, But Not Greater Than Necessary to Comply With the Purposes of Sentencing under 18 U.S.C. § 3553(a)

As noted in this Court's Memorandum on the Policy Regarding Procedures to be Followed in Sentencing, the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Fourth Circuit's ruling in *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005), require courts to consider not only the recommended guideline range, but also the sentencing factors under 18 U.S.C. § 3553(a), in determining the appropriate sentence.

The overriding principle and basic mandate of Section 3553(a) requires district courts to impose a sentence *"sufficient, but not greater than necessary,"* to comply with the four purposes of sentencing set forth in Section 3553(a)(2): retribution (to reflect the seriousness of the offense, to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision." This requirement is not just another factor to be considered along with the others set forth in Section 3553(a) — it sets an independent limit on the sentence.

In determining the sentence sufficient but not greater than necessary to comply with the § 3553(a)(2) purposes of sentencing, the court must consider several factors listed in § 3553(a). These are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentence available; (3) the guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(3), (a)(5)-(7). Neither the statute itself nor *United States v. Booker* suggests that any one of these factors is to be given greater weight than any other factor.

### A.
### History and Characteristics of Patrick and Nature of the Offense

Patrick was not an organizer, leader, manager, or supervisor in the criminal activity. (PSR ¶ 27.) He has absolutely no criminal history (¶ 46-53) and until becoming partners with a previously sentenced officer, he led an exemplary career as a police officer and this conduct was so "out of character". (¶ 58 and 63.) Patrick worked for the Bakersfield Police Department for 13 years and was described his overall diligence as a detective, numerous acknowledgements for his professionalism, and his service. (¶ 63.) He had promoted from Officer, to Senior Officer, and finally Sergeant, prior to this case.

The nature of this offense is certainly out of character for Patrick considering those who know him describe him as "honest and straight forward", "caring family man", and someone willing to intervene in a knife assault. (¶ 58.)

### B.
### A Sentence of 36 Months Would Promote Respect for the Law, Provide a Just Punishment, Afford Adequate Deterrence, and Avoid Unwarranted Disparities in Punishment

Section 3553(a) also provides that courts should strive to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides a just punishment, affords adequate deterrence, protects the public, and allows for rehabilitation. The Court must also consider the need to avoid unwarranted sentencing disparities between defendants who have engaged in comparable conduct. A sentence of 36 months would be more than sufficient to accomplish those

goals in this case.

The previously sentenced defendant (DIAZ) recently received a sentence of 60 months from this Court. There has been much said about who deserves "more" custody time. However, those who have worked this investigation most closely have authored pleadings in which it was written that Patrick is no "more" culpable or deserving of a greater sentence.

A sentence of 36 months in this case would be much more in line with the sentence received by Patrick's co-conspirator, who suffered additional convictions for bribery and filing false tax returns.

In addition, Patrick has never before been before any court of law for the purpose of being sentenced for any criminal act. Notwithstanding the serious breach of public trust by Patrick, his opportunity to ever serve as a law enforcement officer is permanently foreclosed. Moreover, his prospects of meaningful and substantial employment will be severely limited.

Any potential for Patrick to once again find himself confronted with the opportunity to commit this type of criminal conduct is permanently long gone.

Considering all of these factors, Defendant PATRICK MARA respectfully requests the Court to impose a total sentence of 36 months. Such a sentence would take into account the gravity of Patrick's conduct and would amount to the most serious sentence that Patrick has ever received. In sum, such a sentence would more than adequately serve the needs outlined in § 3553(a)(2), and thereby satisfy the "parsimony provision" of that section.

WHEREFORE, the defendant, MR. PATRICK MARA prays that this Honorable Court sentence him to no more than 36 months in prison.

October 19, 2016

Respectfully submitted,

Fred Gagliardini